# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| LEONARD RYALS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-01879-JEO |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this action, plaintiff Leonard Ryals challenges the United States of America's claim of ownership of the following 40-acre tract of land: the SE¼ of the SW¼ of Section 6, Township 22 South, Range 5 East, Huntsville Meridian, Clay County, Alabama (the "Property"). (Doc. 1 at ¶ 28). Ryals contends that he, not the United States, is the owner of the Property. He has asserted two claims against the United States: a quiet title claim pursuant to the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, and a taking claim seeking "just compensation" for the alleged taking of his Property.[1]

Before the court is the United States' motion to dismiss Ryals's claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Doc. 18). Ryals has consented to the dismissal of his taking claim (without prejudice), but

---

[1] Ryals's original complaint also contained a reference to the "Little Tucker Act," 28 U.S.C. § 1346(a)(2). (Doc. 1 at ¶ 17). Ryals subsequently amended his complaint to remove that reference. (Doc. 15). Accordingly, that claim is deemed to be dismissed without prejudice.

opposes the dismissal of his QTA claim. (Doc. 24). The court held a hearing on the motion to dismiss, which extended over three days. Both sides offered witness testimony at the hearing. For the reasons set forth below, the United States' motion to dismiss is due to be granted in part and denied in part.

## I. BACKGROUND

### A.     The Quiet Title Act

The QTA "waives the United States'[ ] sovereign immunity and permit[s] plaintiffs to name it as a party defendant in civil actions to adjudicate title disputes involving real property in which the United States claims an interest." *McMaster v. United States*, 177 F.3d 936, 939 (11th Cir. 1999) (quotations and citation omitted). The QTA provides "the exclusive means by which adverse claimants [can] challenge the United States' title to real property." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983).

An action under the QTA "shall be barred unless it is commenced within twelve years of the date upon which it accrued." 28 U.S.C. § 2409a(g). A QTA action is deemed to have accrued "on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." *Id.* "[B]ecause the statute of limitations circumscribes the scope of the QTA's waiver of sovereign immunity, compliance with the limitations period is jurisdictional."

*F.E.B. Corp. v. United States*, 818 F.3d 681, 685 (11th Cir. 2016) (citing *United States v. Mottaz*, 476 U.S. 834, 841 (1986), and *Block*, 461 U.S. at 292).

The QTA's limitations period "must be strictly observed" and courts "must be careful not to interpret it in a manner that would 'extend the waiver [of sovereign immunity] beyond that which Congress intended.'" *Block*, 461 U.S. at 287 (quoting *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979)). Accordingly, "the QTA's statute of limitations standard does not require the government to provide explicit notice of its claim in order for the statute of limitations to begin running." *F.E.B. Corp.*, 818 F.3d at 686 (quotations and citation omitted). Rather, "[a]ll that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." *Id.* (quotations and citation omitted). Indeed, "the merits of the government's claim are irrelevant: Even invalid government claims trigger the QTA limitations period." *Id.* As noted by the United States, "Other circuit courts have articulated the standard this way: '[a]s long as the interest claimed *is a cloud on title*, or a reasonable claim with a substantial basis, it constitutes a claim for purposes of triggering the twelve-year statute of limitations.' *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001) (emphasis added) (quotations and citation omitted); *Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*, 599 F.3d 1165, 1176 (10th Cir. 2010) ('[T]he United States need not assert a full legal title in the

disputed property for the limitations period to accrue; the claimed adverse interest in the title of the property merely must be substantial enough to create a cloud on title.')."[2]  (Doc. 26 at 3).

## B.    Rule 12(b)(1) Standard

The United States has moved to dismiss Ryals's QTA claim pursuant to FED. R. CIV. P. 12(b)(1).  A motion to dismiss under Rule 12(b)(1) challenges subject-matter jurisdiction and may take the form of either a facial attack or a factual attack.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990).  Here, the United States' jurisdictional challenge to Ryals's QTA claim is a factual attack. (Doc. 18 at 3, n.2).  A factual attack "challenges 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'"  *Id.* at 1529 (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).[3]  When an attack is factual, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness

---

[2] "A cloud on title may be broadly described as an outstanding instrument, record, claim, or encumbrance that is invalid or inoperative but which may nevertheless impair the title to property." 20 Fla. Jur.2d Ejectment and Related Remedies § 79. "It has been repeatedly held that a cloud is not created by a mere assertion, whether oral or in writing."  I. Blum, Annotation, *What Constitutes Cloud on Title Removable in Equity,* 78 A.L.R. 24 (1932).  *Lane v. Guaranty* Bank, 6:13–CV–85–ORL–18DAB, 2013 WL 1296751, *2 (M.D. Fla. Apr. 1, 2013), aff'd, 13–12605, 2014 WL 128667 (11th Cir. Jan.15, 2014).

[3] Under a facial attack, the allegations in the plaintiff's complaint are taken as true for purposes of the Rule 12(b)(1) motion. *Lawrence*, 919 F.2d at 1529.

attaches to a plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

The Eleventh Circuit has cautioned, however, that "the district court should only rely on Rule 12(b)(1) if the facts necessary to sustain jurisdiction *do not implicate the merits of plaintiff's cause of action*." *Douglas v. United States*, 814 F.3d 1268, 1275 (11th Cir. 2016) (emphasis in original) (quotations and citation omitted). If the jurisdictional challenge does implicate the merits of the plaintiff's claim, then the proper course of action "is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* (quotations and citation omitted).

## II. ANALYSIS

### A. Identification of the Issues

The United States argues that the court lacks jurisdiction to hear Ryals's QTA claim because it is barred by the QTA's twelve-year statute of limitations. As noted above, this is a factual challenge to the complaint. (*See* Doc. 18 at 3, n.2). The United States specifically asserts that Ryals or his predecessor should have known of the United States' claim to the Property "decades ago" based on (1) a proclamation issued by President Franklin D. Roosevelt in 1936 that established the Talladega National Forest and identified the areas that were being reserved for

the national forest, which include the land encompassing the Property; (2) a land survey conducted for the U.S. Forest Service in 1986 that marked the western and southern boundaries of the Property as part of the Talladega National Forest; and (3) a U.S. Forest Service map from 1997 showing that the Property is part of the Talladega National Forest. (Doc. 18 at 4-7). Ryals responds that the notice specified by the United States is inadequate to trigger the statute of limitations. (Doc. 24 at 3). Instead, Ryals asserts he first learned of the interest of the United States in the Property after a fire occurred on the Property approximately six years ago. (*Id*. at 4).

**B. Evidence**

Because this case involves a factual attack to the complaint, the court conducted an evidentiary hearing on the foregoing matters. Four witnesses were called: Garner Westbrook, Michael O. Lange, Leonard Ryals, Bobby Ryals, and Larry Murphy.

As noted at the outset, the property at dispute is a 40-acre tract of land located in the southeast ¼ of the southwest ¼ of Section[4] 6, Township 22 South,

---

[4] A section is approximately 640 acres and a township is 36 sections. (Doc. 36 at 53). Sections were cordoned-off in the 1830s as a result of surveys done by the General Land Office of the United States. When the surveys were conducted, each corner of a section (*i.e.* northeast, northwest, southwest and southeast) was typically marked with some type of monument that was placed in the ground. (*Id*. at 53-54, 56).

Range 5 East, Huntsville Meridian, Clay County, Alabama. (*See* Doc. 18-4 at 2). It is within the area known as the Talladega National Forest.[5]

The United States Forest Service had Section 5 and a portion of Section 6 of Township 22 surveyed in 1986. (Doc. 36 at 53; Doc. 18-4 at 2). Westbrook, a "lands unit leader" with the Forest Service who is charged with acquiring land for the National Forests in Alabama, testified that he *believed* the survey was done to maintain land lines for the property of the United States. (Doc. 36 at 51 & 55). The survey was documented by a "map drawn from an actual field land survey" that was certified by Guy S. Johnson, a registered professional engineer and land surveyor from Moulton, Alabama, on May 20, 1986. (Doc. 18-4 at 2).

Westbrook testified that the procedures used in 1986 to survey and mark Forest Service land are consistent with those found in the Forest Service Manual in use today. (Doc. 36 at 66). The relevant portion of the manual, section 7153.62 – Marking and Posting, states:

> The location of a property line normally is to be indicated by marking and posting. Marking includes (1) clearing away brush, small trees, and debris along the line; (2) making blazes and hack marks on trees along the line; and (3) painting blazes, posts, and rocks along the line and at corner locations. Posting includes setting such posts at corner sites and, as may be required, along the line, and attaching signs to those posts and to trees standing on the line or serving as corner monuments.

---

[5] The Property is depicted in a Forest Service map found in the record at document 18-2 in the record. It is located in the center of the document and is shown as a square with diagonal lines through it.

(Def. Exh. 2 (1965 Forest Service Manual) at 21 of 34). A blaze is a mark "made by cutting off, at breast height, a vertical strip of bark and a very thin layer of the underlying live wood tissue." (*Id*. at 22). It typically is about 6-8 inches long and 2-4 inches wide, and the top and bottom ends are "smoothed out." (*Id*.) It is painted red to represent a Forest Service marking. (Doc. 42 at 12). If the guidelines are followed by the surveyors, the Forest Service property will be marked with blaze marks and signs on the boundaries, indicating the land is Forest Service property.[6] (*Id*.at *8*-13). The blaze markings are "painted with a heavy-base red enamel implement paint." (Def. Exh. 3 at 105). This process is referred to as true line marking.

Lange, a Regional Land Surveyor with the Forest Service, testified that a bold line on a survey indicates that the line depicted is consistent with "a true line marked." (Doc. 42 at 6-9, 13, 16). The Surveying Guide specifies that a "true line is the line that exists on the ground – not the line shown on the plat." (Def. Exh. 3 at 78). It is the line that marks where Forest Service land adjoins private property. (*See* Doc. 42 at 28). Lange stated that he obtained the field survey notes from Forest Service records involving the contract that included the 1986 survey. (Def. Ex. 4). They include a copy of the survey map mentioned above (*id*. at 6 of 7) and a certification that the notes represent the work done under the supervision of Mr.

---

[6] These requirements are further detailed in the Forest Service Land Surveying Guide ("Surveying Guide"). (*See* Def. Exh. 3 at 103-07 of 209).

Johnson (*id*. at 7). Lange further stated that the work done by Johnson's crew would include physically marking the property lines consistent with the Forest Service Manual.[7] (Doc. 42 at 16-17). Concerning the disputed Property in this case, Johnson's 1986 survey map indicates that the Western and Southern boundaries of the Property were "true line marked."[8] (Doc. 18-4 at 2). Consistent with the foregoing information, a "bearing tree" marker sign was placed on a tree at one of the corners on June 9, 1986. (Doc. 18-7 at 4). Lange believes this sign and the corner marker in the ground are evidence of the true line having been marked. (Doc. 42 at 71).

Leonard Ryals is 95 years old. He has been in the business of purchasing and selling land and timber rights for over sixty years. He has been harvesting lumber from the forests in this area since the beginning of the 1950s. He has been familiar with the disputed 40-acre plot since he first cut timber on adjoining

---

[7] Lange derived this conclusion from the fact that Johnson's work would have been inspected and he would not have been paid if the work had not been properly performed. (Doc. 42 at 16-17, 24). He also noted that Johnson had to have completed the work because the work was "accepted" by the contracting officer for the Forest Service. (*Id*. at 24, 43).

[8] Lange's testimony demonstrated that Johnson's survey fails to depict a "true line marked" with regard to some private land in the northeast corner of the southeast corner of Section 6. (Doc. 42 at 30-32, 63-66). Lange also stated that there were no records demonstrating what actual markings or postings were made during the 1986 survey. (*Id*. at 30-32). He also acknowledged he had no personal knowledge whether the required work was actually done. (*Id*. at 43-44).

  The court notes that the document does not indicate that the 1986 survey revealed "old red painted lines" from previous surveys or markings for this property. (Doc. 18-4 at 2; Doc. 42 at 54).

property about the same time. (Doc. 24-1 at 2; Doc. 42 at 74-75).[9] He harvested

timber on the adjoining land twice since the 1950s. When he purchased timber

rights on one of the adjoining properties from the Forest Service in 1956, he was

shown where he could cut timber – to the property line for the forty acres he later

purchased (the Property). (Doc. 24-1 at 2; Doc. 42 at 74-75, 79-80). He has

walked the Property many times over the last sixty years. (*Id.* at 80). On at least

one occasion, he purchased the timber on the Property from the former owner.

(Doc. 24-1 at 3). Ryals stated that when he was cutting timber before he bought

the Property, he did not see any painted red line that separated the Property. He

was emphatic when he stated, "There was never a red line" on it.[10] (*Id.* at 81, 96,

102-03).

---

[9] During his testimony, Ryals stated that he believed the disputed land was settled by the
Chandlers in 1750. Four or five generations of Chandlers were raised on the property. (Doc. 42
at 77). They sold the property to the Harveys in 1923. (Doc. 24-1 at 2).

[10] At one point during his testimony, Ryals did state that there was a red line that was
"separating" the Property. (Doc. 42 at 81). However, it is unclear when Ryals may have seen
this red line. As further discussed below, Ryals later clarified that there was never a red line on
the Property until after the Forest Service conducted a controlled burn in the forest in 2010 or
2011. (*Id.* at 96). Ryals also stated the property on his western line was formerly owned by Carl
Lumber (also known as Evergreen). According to Ryals, the lumber company did not distinctly
mark their property lines. (*Id.* at 97). However, it was always blue paint that separated their
properties. (*Id.* at 102-03). Carl's land was later sold to the United States about one year ago.
(*Id.* at 101).

   Ryals also stated that there still was an old fence line on portions of the Property from the old
fence that previously encompassed the Property. (*Id.* at 111-12). He noted that the fence on the
east side of the Property ran from the southeast corner mark north. (*Id.* at 88-89). It was so old
that the trees had grown around the wire. (*Id.* at 89). He also noted that there were metal stobs
on each corner. (*Id.* at 112).

Ryals purchased the Property from Lillian Harvey on October 26, 1993, for $30,000.  (Doc. 1, Ex. A).  Shortly after Ryals purchased the land, he hired Larry Murphy to reestablish the property lines.   (Doc. 42 at 84, 126).   Murphy is a forester who manages rural properties.  (Doc. 41 at 5-6).  This was around 2000. (*Id*. at 5-7).  Murphy and  Ryals went to the marker on the southeast corner of the Property and proceeded directly north to the northeast corner of the Property where they found a monument in the form of a "rock pile." (*Id*. at 6-12).  While walking to the north on the eastern boundary, Murphy observed a red painted line.  (*Id*. at 10, 13).  This was the only red line that he saw while they were walking the Property.  (*Id*.)  Murphy also noted there was an old fence at the northeastern marker.  (*Id.* at 7, 20-21).  They traversed the entire perimeter of the Property via markers such as piles of rocks and old fences.  (*Id*.)  They located each of the corners for the Property.  Murphy did not recall seeing the marker or bearing tree sign located on the southwest corner of the Property.  (*Id*. at 18, 21-23).  He acknowledged that it was possible he missed the red property boundary on the west side of the Property if one was there.  (*Id*.)  They (Ryals and Murphy) "came back and painted all the property lines blue" after they had established the boundaries. (*Id*. at 7; Doc. 42 at 102-03, 110).  Murphy also determined that as recently as June 2017, the Clay County Tax Assessor records showed that Ryals still was deemed to be the owner of the Property.  (Doc. 41 at 9).

Ryals purchased the land again in 2014 from Robert L. Rumsey, III, so that he could have clear title to the Property. (Doc. 24-1 at 1). Apparently, a deed to the Property executed in 1924 involving the Rumsey family was not recorded until 1977, resulting in a cloud on the title. Ryals decided to purchase the Property a second time to resolve the matter. (*Id.*)

In about 2010 or 2011, the Forest Service conducted a controlled burn in the Talladega National Forest. At some point after the burn, Ryals visited the Property and discovered the damage to the trees from the fire. (Doc. 24-1 at 3; Doc. 42 at 80). He stated, "I went out to see just take a look at this land, see that everything's all right and somebody had just burnt it off and killed all my timber, destroyed all my pine. And all my reproduction, just killed it all."[11] (Doc. 42 at 82). He also discovered that the Forest Service had painted a red line on the Property. (*Id.* at 96). According to Ryals, "There wasn't [any] red paint as far as I know; as far as I know there was never red paint before the fire. They painted the red after the fire." (*Id.*)

Ryals complained about the burn to someone he believes was named Gloria with the Forest Service. (*Id.* at 83). She stated she would look into the matter. Thereafter, Ryals learned that the Forest Service claimed the property belonged to the United States. (*Id.* at 83-84). After the incident, he painted what he believed

[11]The court notes that Ryals was visibly moved when revisiting the event in the courtroom.

were his property lines using blue paint. Someone from the Forest Service would then remove his markings. This happened twice. (*Id*. at 84).

Ryals has been paying the taxes on the Property since he purchased it in 1993.

The Forest Service issued a letter on September 7, 2016, to Ryals to determine whether he was intending to file an application concerning his claim to the Property. (Doc. 1-1 at 26 of 26).

## C.    Analysis

The United States first argues that a proclamation issued by President Franklin D. Roosevelt in 1936 that established the Talladega National Forest and identified the areas that were being reserved for the national forest, which include the land encompassing the Property, placed Ryals or his predecessor in interest on notice of the United States' adverse claim to the Property. (Doc. 18 at 4). Ryals responds that the proclamation did not take private land or place his predecessor in interest on notice. (Doc. 24 at 4). Instead, he asserts, it simply allowed the United States Secretary of Agriculture to purchase lands within the borders identified in the proclamation. (*Id*.) The United States replies that the proclamation, along with the marking of the boundaries, is "more than sufficient to create a cloud on the title

of the property at issue and trigger the Q[uiet] T[itle] A[ct's] statute of limitations."[12]  (Doc. 26 at 3-4).

The court finds this first argument to be unavailing.  The Proclamation provides:

> WHEREAS certain forest lands within the State of Alabama have been or *may hereafter be acquired* by the United States of America ….
>
> WHEREAS it appears that it would be in the public interest to reserve and designate said lands and certain adjoining public lands as the Talladega National Forest;
>
> NOW THEREFORE, I, Franklin D. Roosevelt, President of the United States of America, by virtue of the authority invested in me [as President] … , do proclaim that there are hereby reserved and set apart as the Talladega National Forest all lands of the United States within the following-described areas, and that all lands therein *which may hereafter be acquired by the United States* … shall upon their acquisition be reserved and administered as a part of the Talladega National Forest….

(Doc. 18-6 at 4 of 5 (citing 1 Fed. Reg. 859, 860 (July 23, 1936) (italics added)).  It is clear this proclamation did not take any privately owned land.  It specifically refers to land owned by or which may later be acquired by the United States.  It recognizes that at the time of the proclamation there was land in the specified area that was privately held.  This is not disputed by the parties to this action.  Thus, the issuance of the proclamation is insufficient to constitute notice to commence the running of the statute of limitations.  At most, it is indicative of the intent of the

---

[12] The court will address the impact of the cumulative impact of the Proclamation and the markings below.

Forest Service to purchase private property located in the confines of the Talladega National Forest in the future.

To the extent the United States argues that "[o]ther courts have found that similar executive orders or proclamations place a plaintiff on notice for the purposes of the accrual of the QTA's statute of limitations," this court finds the cited cases to be distinguishable. In *George v. United States*, 672 F.3d 942, 944 (10th Cir. 2012), the court stated that "the QTA's limitations clock starts running as soon as the federal government publishes a property claim in the Federal Register . . . ." (citing 44 U.S.C. § 1507)). However, *George* is factually distinguishable. The plaintiff in that case wanted to erect a fence over a road that ran through her property. The problem was that the Forest Service had a long-standing easement on the road that was in force and effect when the previous land holder purchased the property in 1979. Additionally, in 1977, the Secretary of Agriculture published a regulation in the Federal Register that "prohibited anyone from 'placing ... [a] fence ... without a permit' anywhere in the 'National Forest System' or on its '[f]orest development road[s] or trail[s].' 36 C.F.R. §§ 261.10(a); 261.1(a) (1977)." *George*, 672 F.3d at 945. The court concluded that on these facts, the plaintiff's predecessor was legally charged with notice of the Forest Service regulations that triggered the running of the statute of limitations.

In *Gov't of Guam v. United States*, 744 F.2d 699, 701 (9th Cir. 1984), the court held that an executive order "stat[ing] that the lands in question were being reserved to the United States" published in the Federal Register "constituted formal notice to the world of the United States' claim." This case is factually inapposite to the present matter because the executive order issued in October 1950 reserved certain lands that were to be administered by the Secretary of the Navy while other land was transferred to the Government of Guam. The lawsuit was barred because it was filed over twelve years after the elected Government of Guam was charged with notice of the claims of the United States to the property pursuant to the executive order. Unlike the land in this case, the land in dispute in *Guam* was specifically listed as belonging to the United States. *Id*. at 700-01.

In *Warren v. United States*, 234 F.3d 1331, 1337 (D.C. Cir. 2000), the court stated that a presidential proclamation reserving the land at issue (an island) for lighthouse purposes was evidence that the United States claimed an interest in the property for purposes of the QTA's statute of limitations. However, there is much more to that holding. The court did rely upon the proclamation reserving the island in question for a lighthouse, but the court coupled that with "the Coast Guard's practice of restricting access, and, for some years, denying access altogether, to the Island, as well as the Government's consistent claims of sole and exclusive ownership," including actual notice of the United States' claim to the island to the

plaintiff's predecessors in interest, to find that the United States had reasonably and clearly indicated it had "revoked any outstanding rights or interests to 'occupy' the … [i]sland for the purpose of mining guano." *Id*. Thus, this court holds that *Warren* does not compel a finding on behalf of the United States in this instance.

The United States next argues that the 1986 land survey conducted for the Forest Service that purportedly marked the western and southern boundaries of the Property as part of the Talladega National Forest placed Ryals or his predecessor in interest on notice of the United States' claim. (Doc. 18 at 6). In support of this contention, the United States cites *Howell v. United States*, 519 F. Supp. 298, 304 (N.D. Ga. 1981), for the proposition that "[f]rom the painted trees the plaintiff and his predecessor in title … should have known of the government's claim to the area now in dispute." Ryals responds that the markers in this case do not identify the "owner or which corner such owner is trying to mark"; markings such as those discussed by the Forest Service are common to other private land owners; the signs and markings do not identify the owners of the Property; and the color of the markings on the Property in this case is disputed. (Doc. 24 at 7-8).

At the outset, the court finds *Howell* distinguishable. In that case, the evidence of notice of the dispute was clear. The court stated:

> The record is clear that plaintiff was aware of the Government's claim by the painted lines at the time of his purchase in 1956. He was told by [his predecessor in interest] that the Forest Service had painted lines and while plaintiff continued to exercise dominion over the open fields and a portion of

Jones Creek, an extension of the lines painted by the Forest Service would clearly have crossed the open fields and included the Jones Creek area in which plaintiff did work on the creek and posted signs.

*Howell*, 519 F. Supp. at 304. The court concluded:

Certainly, under the record in this case, the painting of all the boundary lines except within the area of open fields is adequate to have and did give notice to plaintiff and his predecessor in title … of the extent, claim and interest of defendant in the land contained within the painted boundaries and the extensions thereof across open fields.

*Id*. at 304-05.

As a result of the hearing in this case, the court finds as follows. First, the court is not convinced the Forest Service property lines were ever properly "blazed" so as to place either Mr. Ryals or his predecessor in interest on notice of any claim to the land by the United States. The testimony from the witnesses for the United States was that when the 1986 survey was done, Forest Service procedures required that the surveyor "true line mark" the property lines where land of the United States abuts private land. This means that the property lines for the land of the United States are marked with red paint. The lines are further demarked with signs and monuments if necessary. In support of this testimony, Lange produced the field survey notes for the work done under Johnson's supervision in 1986. The notes include the survey Johnson completed and a certification that the notes represent the work done under his supervision. (Def. Exh. 4 at 7). They clearly depict that the Property at issue is included as land of

the United States and that the western and southern property lines were "true line marked," evidencing that the land of the United States bordered private land on those two sides and that the "true lines" were depicted in accordance with Forest Service requirements.

The survey also shows, however, that Johnson did not record that he observed any "old red painted line[s]." (Doc. 18-4 at 2). This is significant because Forest Service procedures required that these lines be painted red and properly marked because the land of the United States adjoined private land at these points at the time of the survey. This evidence leads to one of three conclusions: the lines were not there; Johnson failed to notice them; or he forgot to note "old red painted line" on his survey. None of these conclusions bode well for the United States on the present motion. If either of the first two alternatives applies, it supports Ryals's claim that neither he nor his predecessor in interest had the requisite notice required to commence the running of the statute of limitations in 1986 as argued by the United States. If the third alternative applies, the integrity of Johnson's work is placed in question. This is particularly noteworthy because of Johnson's apparent error concerning the demarcation on the eastern side of Section 6. The survey fails to depict a "true line marked" on the eastern boundary of Section 6, despite the fact that the testimony established that land of the United

States adjoined private land at that point. (*Id.*) It could also expose that the property line was not properly marked as well.

Placing the foregoing evidence alongside Ryals's testimony that he has been harvesting lumber in this area for over sixty years, that he has been familiar with the Property for about the same time, and that he has never observed a red property line on it, the court is not convinced that the Property has ever been properly marked so as to place Ryals or his predecessor in interest on notice of any claim of the United States. Ryals struck the court as being candid, straight-forward, and emphatic about the absence of red lines marking the property of the United States. His testimony is supported by the testimony of Murphy that he reestablished the property lines on the Property, including painting the lines, for Ryals approximately fifteen to seventeen years ago, and that he only saw a red line on the eastern boundary. He did not observe other markings he would expect to have seen if the Property had been properly marked as belonging to the United States. Further supporting Ryals's testimony is the fact that he and his predecessor in interest have consistently paid the requisite taxes on the Property. Finally supporting his testimony is the fact that he purchased the Property a second time when there was a question regarding the title that was raised by Robert Rumsey,

another private person claiming ownership interest in the land.  Thus, the court finds the argument of the United States fails.[13]

The United States next argues that a U.S. Forest Service map from 1997, showing that the Property is part of the Talladega National Forest, also places Mr. Ryals or his predecessor in interest on notice of the United States' claim.  (Doc. 18 at 7).  Ryals responds that while publically available information, such as media coverage,[14] may constitute constructive notice for purposes of the statute of limitations, the map cited by the United States lacks the publication necessary for purposes of notice in this case.  (Doc. 24 at 8).  Additionally, he states that this type of map is not the kind of public record land owners rely on for determining ownership.  Such records, according to Ryals, would include probate and tax records.  (*Id.*)

---

[13] In reaching this conclusion, the court has considered the "property corner" markers and bearing tree sign evidence each listing a 1986 date.  (*See* Doc. 18-7 at 2-4).  However, none of these provide any evidence that the Property was claimed by the United States.

[14] By way of example, he cites to *Spirit Lake Tribe v. State of North Dakota*, 262 F.3d 732, 738 (10th Cir. 2001), which relied on the following in deciding a notice issue:

> The government's 1971 land acquisition was widely reported by local media outlets, such as the *Devils Lake Journal* and the *Benton County Farmers Press,* and by larger organizations as well.  The Tribe apparently knew of the government's land acquisition because a 1970 tribal resolution expressed concern about land ownership in view of "the coming Garrison Diversion Project."  State App. 23–24.  The Project itself was the single most important, visible public works project in North Dakota in the last half of the 20th century.  The Tribe could hardly have turned a blind eye to its major details.  *See generally In re Garrison Diversion Conservancy Dist.*, 144 N.W.2d 82, 88 (N.D.1966) (describing newspaper coverage of public hearings held in major cities in eastern North Dakota to discuss the contract and deed between the State and the government).  Thus we have little doubt that the Tribe was aware of the Garrison Diversion Project generally, and the government's acquisition of a portion of the lake specifically.

The court cannot find under the circumstances that the publically available map of the Talladega Forest is adequate notice that the United States claimed the Property in this case. There is no evidence the map had the wide-spread publication one would associate with the internet, local newspapers, or local television or radio programing that might have placed Ryals or his predecessor in interest on notice.

Finally, the United States asserts that the combination of all the foregoing public information was adequate to provide the requisite notice. (Doc. 18 at 7). The court has considered the evidence *in toto* and again finds that it is insufficient to satisfy the notice requirement for the reasons stated above.

## III. CONCLUSION

Premised on the foregoing, the court finds that the motion of the United States to dismiss this action (doc. 18) is due to be granted in part and denied in part. A separate order will be entered.

**DONE**, this 13th day of July, 2017.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge